(C. D. 581)

CENTRAL VERMONT RAILWAY, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided January 9, 1942)

*Irvin A. Winegrad* for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Joseph F. Donohue,* special attorney), for the defendant.

Before CLINE and KEEFE, Judges

CLINE, Judge: This is an action against the United States in which the plaintiff seeks to recover money claimed to have been collected in excess of the amount due as customs duties upon a shipment of dried buttermilk imported from Canada into the port of St. Albans, Vt. Duty was assessed thereon at the rate of 6½ cents per pound under paragraph 708 (b) of the Tariff Act of 1930, as dried whole milk. Plaintiff claims that the commodity is not dutiable as dried whole milk, but as dried buttermilk under the same paragraph, because, it is alleged, the commodity does not contain more than 6 per centum of butterfat.

The paragraph in question as enacted in the Tariff Act of 1930 is as follows:

PAR 708.  *  *  *
(b) Dried whole milk, 6½ cents per pound; dried cream, 12⅓ cents per pound; dried skimmed milk and dried buttermilk, 3 cents per pound: *Provided,* That dried skimmed milk containing more than 3 per centum of butterfat, and dried buttermilk containing more than 6 per centum of butterfat, shall be dutiable as dried whole milk; and dried whole milk containing more than 35 per centum of butterfat shall be dutiable as dried cream.

Under the trade agreement with Canada (T. D. 49752) the rate on dried buttermilk was reduced to 1½ cents per pound.

The question for determination is whether the dried buttermilk imported contains more than 6 per centum of butterfat.

Plaintiff concedes that if the Roese-Gottlieb method of analysis which was adopted by the Government chemist is used the butterfat content is shown to be over 6 per centum. However, it contends that this method fails to reveal the true butterfat content; that the

solvent used in such test removes phosphilipins and sterols as completely as it does butterfat. It is plaintiff's contention that this method shows, in addition to the glycerides of fatty acids, also lecithin and sterols which are present in the fatty extract of dried buttermilk and should be subtracted from the total fatty extract, allowing for the normal quantities of lecithin and sterols present in the total fatty extract of whole milk. This method, it is alleged, would yield the true butterfat content.

The Government's contention as set forth in its brief is that "lecithin, while not a component part of true commercial fat, is a normal constituent in butterfat; that any method which subtracts the lecithin content from the total fats, does not determine 'butterfat' but true chemical fat, and that the Roese-Gottlieb method, by which the determinations in the instant case were made, is the accepted procedure for determining the butterfat content of milk products." It is conceded by the Government, however, that if the lecithin were deducted, the butterfat in the imported merchandise would be less than 6 per centum.

The plaintiff introduced the testimony of one witness, a chemist, who is director of the New Jersey Dairy Laboratories and has acted as consultant for the Dairy Equipment Manufacturers, Cherry-Burrell Creamery, Jackson-Wissner and the New Jersey Section of the National Cattle Breeders' Association, and has had various articles published in the Journal of Dairy Science, Journal of Milk Technology, Dairy Manual published by the State of New Jersey, and various trade journals.

The witness described the analysis made by him as follows:

We drew a weighed portion of the sample and treated it with some alkali and ether. There are two ethers, ethyl ether and petroleum ether. After shaking and allowing it to settle—we allow the sediment to precipitate; that is, the solution will form layers —the ether portion is withdrawn, filtered. The ether is volatilized off. The treatment of the extracted material with the alkali is repeated and then a third extraction is made, and all of the ether extraction is combined. The total fat we obtained in our analysis was 6.085 per cent. The fat was then subjected to an ashing to determine the phosphorus.· That is the phosphorus was determined in the ash and the lecithin was calculated using a factor for lecithin established by various analysts as the proper value for lecithin. We found a lecithin content of the total fat of 17.8 per cent. Shall I detail the method used for the lecithin analysis?

Judge KINCHELOE. Just tell us what you did, your conclusion, and how you arrived at that conclusion.

The WITNESS. The lecithin analysis consisted of dissolving the ash in hydrochloric acid and neutralizing, and then aliquoting a portion after the dissolution is made and then treating it with ammonium molybdate, and stannous chloride was used to develop the blue color, the color of the unknown is matched against the color of the known sample and controls the run at each ·stage. The value we

obtained for the lecithin content of the total fat in the sample of this buttermilk was 17.8 per cent lecithin.

He stated that the butterfat was not identified completely but they subtracted their value of lecithin from their value of the total fat and obtained a result which showed a butterfat content below 6 per centum—not more than, say, 5.1 per centum. The witness explained the difference between an analysis of buttermilk or skimmed milk and an analysis of other milk products so far as ascertaining the butterfat content is concerned, to be as follows:

* * * In the churning process, the envelopes of the fat globules are torn off and go into the buttermilk. The buttermilk therefore has a much higher relationship of envelope material, of what we call envelope material, than do other dairy products. This envelope material consists largely of phospholipids. We therefore have a much higher concentrate of phospholipids in buttermilk than we have in other dairy products.

In support of these statements the witness cited articles in the Journal of Dairy Science, vol. 15, by L. F. Palmer and H. F. Wiese, also vol. 16, p. 41, 1933; vol. 17, p. 29, 1934; vol. 18, p. 827, 1935. He also cited as authority on the value of lecithin content of milk products Bulletin 401, of March, 1935, issued by Purdue University, Agricultural Experimental Station, Lafayette, Ind. He stated that the method pursued in making his analysis is an accepted method by well-known authorities such as those referred to above and is the well-recognized method adopted in ascertaining the amount of butterfat in dried buttermilk. In support of this last statement he cited a number of articles and authorities, including a textbook.

On cross-examination the witness stated that he did not make any distinction between butterfat and total fat content in determining the butterfat content of dried whole milk. His definition of "butterfat" was given as "a mixture of monoditry-glycerides secreted by a normal lactating * * * animal—when removed from the protein and carbohydrate constituents from which it may normally be removed. Butterfat, as such, is also devoid of phospho-protein (phospholipids) beyond the phospholipids of normal products." He defined "total fat" as follows: "Total fat differs from butterfat in that it includes all materials which may be extractable with fat solvents. In this category are included phospholipids and sterols." The witness distinguished between the butterfat content of normal products and that of buttermilk as follows: "In the butterfat of buttermilk we have a very different lecithin relationship than we have in normal products as normally secreted by the cow or any other mammal."

This witness admitted that he had had no occasion to determine in any commercial application the butterfat content of skimmed milk

or dried buttermilk, but had had occasion to determine the total fatty extract, and stated that the authorities mentioned by him, viz, Research Bulletin 175 of the Iowa State College of Agriculture, by Bird; an article by Holm, Wright, and Daysher, and an article by Heinemann, in the Journal of Dairy Science, define the term "butterfat" as the fatty acid material minus the phospholipids and lecithin content.

He admitted that the publication entitled "The Structure and Composition of Foods" by L. Winton was a standard authority, but stated that he considered the following statement found in that work superficial:

In general milkfat, also known as butterfat, is a mixture of glycerides of fatty acid with a small amount of colestrol, lecithin, free fatty acid, and possibly other constituents in minute amounts.

The Government introduced the testimony of two witnesses, both chemists. The first of these, a chemist in the customs laboratory at the port of Boston, with an experience extending over 15 years in the examination of food products, stated that he had analyzed a sample of the commodity here before us for the purpose of determining its butterfat content and had used the Roese-Gottlieb method. As a result of his first two analyses he found the butterfat content to be 7.1 per centum and 7.2 per centum, respectively. At the request of the plaintiff he tested another sample of this same shipment about 3 months later and obtained a result of 7.1 per centum butterfat. This witness stated that he had made only one analysis of dried buttermilk previous to his tests of this commodity. He also stated that the Roese-Gottlieb method was used very extensively by chemists in the government departments and so far as he knew the plaintiff's method has no recognized official application. He considers the terms "fat" and "butterfat" content synonymous as applied to milk products. He also stated that the handbook of the A. O. A. C., "The Official and Tentative Methods of Analysis of the American Official Agricultural Chemists," which was admitted to be an authority by the plaintiff's chemist, contains no procedure for analysis of dried buttermilk and that he used the procedure therein outlined for dried milk.

The Government's other witness had been in charge of the laboratory of the United States Food & Drug Administration at the port of Philadelphia, for the past 6 years and prior to that in charge of the New York laboratory of the United States Food & Drug Administration for 10 years. He is a member of the association of Official Agricultural Chemists, and has been engaged continuously as a food chemist for 29 years. This witness testified that he had made or

supervised thousands of analyses of milk products for the purpose of determining their butterfat content but hadn't examined more than two samples of dried buttermilk. He stated that the Roese-Gottlieb method was reliable and had been the official method for many years and was followed by his department. He also stated that butterfat is not a pure chemical compound; that it is not even all fat; it contains sterols and phospholipins, which are natural concomitants that go along with butterfat.

The witness disagreed with the definition of butterfat given by the plaintiff's witness. He defined that term as follows:

It is the fat found in normal milk. Milk fat and butterfat are synonymous. Butterfat contains a bulk quantity of lecithin; it contains a bulk quantity of sterols, it contains a bulk quantity of phospholipins. They are all in there, but there is no definite, fixed, chemical composition for butterfat. If the cows are fed different things, it will change the composition of butterfat. Different seasons of the year change the composition of butterfat. I am speaking strictly from a chemical point of view. You cannot give any strict definition of butterfat. You can say it is the triglycerides of fatty acids, but it contains not only the fats but those other things, too.

He regards the triglycerides of fatty acids as pure chemical fat. The fat found in milk products is always mixed with sterols and other things in varying proportions. He stated that he agreed with the definition of butterfat in Winton's book, quoted above and considered it an accurate statement, without qualification.

On cross-examination he stated that he did not accept "The Study of Lecithin Content of Milk and Milk Products," a work cited by the plaintiff, as absolutely correct. He had never seen nor heard of Research Bulletin 175 of March, 1935, from the Iowa State College of Agriculture; was not familiar with the article entitled "The Phospholipids of Milk" in the Journal of Dairy Science, vol. 16, 1933, by G. E. Holm, P. A. Wright, and E. F. Daysher, and stated that he was willing to accept the statements made by the plaintiff's witness that there was a considerable difference in the fatty extract of buttermilk and the fatty extract of normal milk. He didn't know whether the range of limitation of lecithin in dried buttermilk is much greater than in normal milk, but is willing to accept the statement of plaintiff's witness as to that. He stated that he is not familiar with the Journal of Dairy Science of September, 1937, with regard to the relation of phospholipids to fat in dairy products, nor the Fundamentals of Dairy Science, second edition, by Rogers, as to the solubility of lecithin. He testified that the material obtained by the Roese-Gottlieb method is fat and it is also other things, and in that fat lecithin is ordinarily included. He didn't know whether there is a much larger percentage

of lecithin in that fat than there is in whole milk, but he would not dispute that statement.

We therefore must determine whether the plaintiff has sustained the burden of proof in regard to his contention that the Government's analysis by which it arrived at the butterfat content of this dried buttermilk fails to give the true butterfat content of dried buttermilk. From the summary of the evidence as set forth above it will be seen that the testimony of the plaintiff's witness is supported by numerous articles from publications, some of which are standard authorities and others the result of several experiments made by agricultural institutions, or tests and analyses made by men who are recognized authorities in the chemical field. The consensus of these is that the terms "fat" and "butterfat" are not synonymous, total fat differing from butterfat in that it includes all material that may be extractable from fat solvents, in which are included phospholipids and sterols. The Roese-Gottlieb test used by the Government chemist fails to show the amount of butterfat content in dried buttermilk, but shows rather the amount of total fat.

We think the testimony produced on the part of the plaintiff shows that something more must be done to the result obtained by the Roese-Gottlieb test in order to determine the true butterfat content of dried buttermilk. This is shown as a result of experiments undertaken by chemists engaged in research work, whose findings have been embodied in articles published in works cited by the plaintiff's witness.

While the witnesses on the part of the Government do not agree with this and consider the Roese-Gottlieb test sufficient, one of them stated that he was willing to accept the statements of plaintiff's witness that there is considerable difference in the fatty extract of buttermilk and the fatty extract of normal milk, and, while he doesn't know whether or not the range of limitation of lecithin in dried buttermilk is much greater than in normal milk, he was willing to accept the statement that such is the fact.

The court is loath to reject the findings of specialists in a particular field of science, and we are persuaded from the evidence produced that the method adopted by the Government chemists does not give as accurate a result as that outlined by the plaintiff's witness. This is particularly true in view of the fact that no long-continued customs practice connected with the analysis of dried buttermilk by the customs laboratories at the various ports of the United States has been shown. In fact, the evidence discloses that Government chemists have had very little occasion to examine the commodity dried buttermilk for the purpose of determining the butterfat content. We therefore accept the finding of the plaintiff as to the butterfat content

of the dried buttermilk in suit and find that it contains less than 6 per centum of butterfat and is dutiable at 1½ cents a pound as dried buttermilk under paragraph 708 (b) of the Tariff Act of 1930, *supra,* as modified by the trade agreement with Canada (T. D 49752).

Judgment will be rendered accordingly. It is so ordered.